IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

STEVEN COLLIER, :

            Plaintiff,

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
            Defendant. :

Case No. 3:09-cv-323

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).

Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury.  *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act.  42 U.S.C. §1381a.  With respect to the present case, eligibility is dependent upon disability, income, and other financial resources.  42 U.S.C. §1382(a).  To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §1382c(a)(A).  A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers.  42 U.S.C. §1382c(a)(3)(B).  Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application.  *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations.  20 C.F.R. §404.1520.  First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled.  Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments;  if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C.F.R. §404.1520(d).  Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment;  if not, the claimant is found not disabled.  Fifth, if the claimant is unable to return to his regular

previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI on March 10, 2004, alleging disability from December 15, 2000, due to low back pain, depression, and anxiety. (Tr. 59-61; 584-85; 84). Plaintiff's applications were denied initially and on reconsideration. (Tr. 40-45, 47-49, 586-94). Administrative Law Judge Melvin Padilla held a hearing, (Tr. 597-632), following which he determined that Plaintiff is not disabled. (Tr. 14-32). The Appeals Council denied Plaintiff's request for review, (Tr. 6-8), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff met the insured status requirements of the Act through June 30, 2005. (Tr. 21, ¶ 1). Judge Padilla also found that Plaintiff has severe lumbosacral degenerative disc disease, a possible seizure disorder which is not supported by objective EEG testing, a history of alcohol abuse in reported remission, a history of narcotic dependence/abuse, and adjustment disorder with depressed mood and anxiety, but that he does not have an impairment or combination of impairments that meets or equals the Listings. *Id.* at ¶ 3; Tr. 24, ¶ 4. Judge Padilla found further that Plaintiff has the residual functional capacity to perform a limited range of medium work. *Id.* at ¶ 5. Judge Padilla then used sections 203.21 through 203.24 (ages fifty to fifty-five) and 203.14 through 203.17 (since attaining age fifty-five) as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy

4

that Plaintiff is capable of performing. (Tr. 31, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 32).

The record contains a copy of treating physician Dr. Boyle's office notes dated January 13, 1970, through March 8, 2002. (Tr. 168-234). Those records reveal that Dr. Boyle treated Plaintiff for various medical conditions including low back pain, anxiety, otitis externa, contact dermatitis, viral hepatitis, and hematuria. *Id.*

Plaintiff was hospitalized April 21, through May 3, 1976, for treatment of probable early or pre-schizophrenia as manifested by restlessness, anorexia, weight loss of fifteen pounds in three months, depression, avoidance of people, paranoid ideation, uncontrolled anger, and somatic complaints related to the gastrointestinal tract. (Tr. 154-55). Plaintiff was treated with therapy and medication and released with the diagnosis of borderline schizophrenia. *Id.*

A July 29, 1988, CT scan of Plaintiff's lumbar spine revealed borderline spinal stenosis at L4-5. (Tr. 148).

An MRI of Plaintiff's lumbar spine performed on September 3, 1992, revealed disc degeneration with disc bulge at L4-5 and quite a small central disc protrusion, disc desiccation with disc bulge at L5-S1 with a small central hard disc/spur that slightly effaced the thecal sac. (Tr. 144).

Plaintiff participated in physical therapy during the period October 23, 1992, through February 3, 1993, for treatment of lumbar, sacral, and sacroiliac sprain. (Tr. 143). Plaintiff was inconsistent in his attendance and was partially compliant with the recommended home exercise program. *Id.*

5

An October 10, 1997, EEG was within normal limits. (Tr. 138).

Plaintiff sought emergency room treatment on February 8, 2002, for complaints of generalized spasms especially of the facial muscles and arms which had started about a week ago. (Tr. 158-67). Plaintiff was treated and discharged with the diagnosis of acute facial muscle spasms. *Id.*

A November 1, 2002, MRI of Plaintiff's lumbar spine revealed multilevel diffuse disc bulges/protrusions, some facet hypertrophic disease, some stenosis, and multilevel lumbar spondylosis. (Tr. 235-35).

Plaintiff consulted with addiction medication specialist Dr. Thomas on September 8, 2003, who reported that Plaintiff went to AA in the early 1990s, had some start and stop use, and quit alcohol totally in 1999. (Tr. 238). Dr. Thomas also reported that Plaintiff's physical exam was "totally within normal limits", that he had chronic low back pain, was opiate dependent with no evidence of addiction, was a stable candidate for continued opiate therapy, and that no chemical dependency treatment was indicated. *Id.*

Examining psychologist Dr. Boerger reported on May 10, 2004, that Plaintiff sustained a work-related back injury in 2000, graduated from high school, stopped drinking five years ago, displayed appropriate speech and thought processes, and that his affect was appropriate to the situation. (Tr. 239-44). Dr. Boerger also reported that Plaintiff started having problems with anxiety about six months after his injury, that he started having panic attacks in about 1995 or 1996, was alert and oriented, appeared to be aware of his health and emotional problems, and displayed characteristics of an anxiety disorder and an adjustment disorder with depressed mood. *Id.* Dr. Boerger identified Plaintiff's diagnoses as panic disorder with

6

agoraphobia and adjustment disorder with depressed mood and he assigned Plaintiff a GAF of 58.  *Id.*  Dr. Boerger opined that Plaintiff's abilities to relate to others and to withstand the stress and pressures associated with day-to-day work activity were moderately impaired, his ability to understand and follow instructions was mildly impaired, and that his ability to maintain attention to perform simple repetitive tasks was unimpaired.  *Id.*

Examining physician Dr. Koppenhoefer reported on May 25, 2004, that Plaintiff sustained a back injury in December, 2000, had constant back pain which was aching in nature, displayed a stable gait with no weakness or antalgia, had mild discomfort in the lower lumbar area, and that he had no spasm or trigger points.  (Tr. 261-67).  Dr. Koppenhoefer also reported that Plaintiff had no discomfort on palpation of the sacroiliac joint, had limited ranges of spinal motion, negative straight leg raising, and that Plaintiff had some tightness of the rectus femoris and hamstring musculature.  *Id.*  Dr. Koppenhoefer noted that Plaintiff had a normal neurological examination and normal examinations of his cervical spine and upper extremities.  *Id.*  Dr. Koppenhoefer opined that Plaintiff's current back pain was related to the degenerative changes noted on MRI, that he was restricted to sedentary to light work duties which would allow him to change position at will and that his ability to sit was limited by his complaints of pain and he should therefore be allowed to change his position on an occasional to frequent basis.  *Id.*  Dr. Koppenhoefer also opined that Plaintiff was able to walk a distance of one-hundred to two-hundred yards, lift up to occasional medium work requirements, and carry light work weights for relatively short distances.  *Id.*

The record contains a copy of Plaintiff's treatment notes from Dayton Pain and Preventive Medicine dated December 22, 2000, through June 15, 2004.  (Tr. 268-341).  On

7

January 19, 2001, Dr. Moore of that facility reported that Plaintiff's medical and neurological examinations were grossly normal, he had some paraspinal tenderness in the cervical and thoracic region, lower lumbar paraspinal tenderness bilaterally on palpation with easily triggered spasm, and negative straight leg lift. *Id.* Dr. Moore identified Plaintiff's diagnosis as lumbar strain/sprain, noted that he had treated Plaintiff with medications and therapies, and that Plaintiff had improved significantly. *Id.* An October 31, 2001, x-ray of Plaintiff's lumbosacral spine revealed degenerative disc disease from L3 through S1 and mild diffuse lumbar spondylosis. *Id.* Drs. Moore and Syllaba reported on November 7, 2001, that Plaintiff had been able to return to work. *Id.* Dr. Syllaba noted on August 22, 2002, with a revision on October 9, 2002, that Plaintiff had "several strikes on contract" with respect to pain medications. *Id.* An MRI of Plaintiff's lumbar spine performed in November, 2002, revealed bulging discs at L3-4, L4-5, and L5-S1. *Id.*

Plaintiff sought emergency room treatment for complaints of increased back pain on June 22, 2004. (Tr. 347-53). The treating physician noted that Plaintiff had run out of methadone and had been dismissed from his pain specialist's office although he (Plaintiff) did not know the reason for the dismissal and that Plaintiff had muscle spasm and tenderness on palpation of the bilateral lumbar musculature. *Id.* Plaintiff was treated with medications and discharged with the diagnosis of lumbago. *Id.*

On June 24, 2004, Plaintiff sought emergency room treatment for complaints of an inability to eat. (Tr. 354-61). The treating physician reported that Plaintiff's symptoms were consistent with an opiate withdrawal, that Plaintiff was offered medication to last over the next two to three days to ease the symptoms of withdrawal but that Plaintiff refused that assistance

8

and demanded he be given something for the pain and something for his nerves, that Plaintiff became increasingly agitated and demanding, and that he was advised to seek care elsewhere. *Id.* Plaintiff's discharge diagnoses were identified as opiate dependency and drug-seeking behavior. *Id.*

On July 21, 2004, Plaintiff sought emergency room treatment for having possibly had a seizure. (Tr. 362-71). The treating physician noted that it was doubtful Plaintiff had experienced a seizure, that Plaintiff had a long history of chemical dependency, that he was "asking for something for nerves", and that his toxicology screen was "positive for benzos". *Id.* Plaintiff was treated and released. *Id.*

The record contains a copy of treating physician Dr. Sanhir's office notes dated July 1-29, 2004. (Tr. 372-80). Those notes reveal that Dr. Sanhir treated Plaintiff for chronic low back pain, depression, anxiety disorder, and tremors, that he had just started treating Plaintiff, and that Plaintiff exhibited positive straight leg raising. *Id.*

Plaintiff was hospitalized August 2-3, 2004, for treatment of suspected seizure activity. (Tr. 381-93). The record of that hospitalization reveals that a CT scan demonstrated small vessel changes in the white matter of the left frontal lobe which was listed as changed from previous CT scan and that Plaintiff's drug screen was negative. *Id.* Plaintiff remained seizure-free and was discharged with the diagnoses of new-onset seizure and depression. *Id.*

The record contains a copy of treating physician Dr. Cataldi's office notes dated January 29 through March 24, 2005. (Tr. 399-404). Those records reveal that Dr. Cataldi treated Plaintiff for management of chronic opioid analgesia. *Id.*

Treating physician Dr. Paulding's office notes dated December 3 through August

25, 2005, are a part of the record.  (Tr. 405-09; 442-43).  Those records reveal that Dr. Paulding treated Plaintiff for back pain, anxiety, depression, seizures, and hypertension.  *Id.*

Plaintiff was hospitalized March 15-21, 2005, after experiencing a depressed mood with suicidal thoughts and a plan to use a gun on himself.  (Tr. 410-24).  At the time Plaintiff was admitted, it was noted that he was severely depressed and withdrawn, that he had entertained thoughts of suicide, and that he felt discouraged.  *Id.*  Plaintiff was treated with medications and counseling and he was discharged in an improved condition.  *Id.*  Plaintiff subsequently received mental health treatment at Samaritan Behavioral Health during the period March 25 through May 10, 2005.  (Tr. 425-41).

Plaintiff sought emergency room treatment on January 13, 2006, for complaints of back pain.  (Tr. 445-47).  The treating physician noted that Plaintiff had some tenderness in the paraspinous muscles bilaterally but no neurologic deficits and that he appeared to have a little back muscle spasm.  *Id.*  Plaintiff was treated and discharged with the diagnosis of low back strain with muscle spasm.  *Id.*

The record contains a copy of treating physician Dr. Ryan's office notes dated May 30, 2005, through November 21, 2006.  (Tr. 448-55; 466-69; 565-76).  Those records reveal that Dr. Ryan treated Plaintiff for low back pain.  *Id.*  A September 30, 2005, MRI of Plaintiff's lumbar spine revealed degenerative disc disease and spondylosis from L3 through S1 with diffuse disc bulging throughout the lumbar spine.  (Tr. 444).

On June 12, and again on June 15, 2006, Dr. Ryan reported that she had been treating Plaintiff since May 30, 2005, his main complaint was back pain in the lumbar area, that he exhibited tenderness over the lumbar area, and that because he was in constant pain and could

10

not sit, stand, or walk for extended periods of time, and that he was unemployable.  (Tr. 460-65).

Dr. Ryan also reported that Plaintiff was able to lift/carry up to ten pounds occasionally and up

to five pounds frequently, stand/walk for one hour in an eight-hour workday and for twenty to

forty-five minutes without interruption, and sit for one hour in an eight-hour workday and for ten

to twenty minutes without interruption.  *Id.*  Dr. Ryan opined that Plaintiff was capable of

performing sedentary work but not light or medium work.  *Id.*

Examining physician Dr. Duritsch reported on August 23, 2006, that Plaintiff was

able to walk on his heels and toes, had decreased ranges of motion of the dorsolumbar spine,

normal sensation and reflexes, and that he had no spasticity.  (Tr. 470-78).  Dr. Duritsch also

reported that Plaintiff was able to mount and dismount the exam table easily and sit comfortably

throughout the examination.  *Id.*  Dr. Duritsch identified Plaintiff's diagnoses as chronic low

back pain, depression for which he saw a counselor, lumbar degenerative disc disease, and

lumbar spondylosis.  *Id.*  Dr. Duritsch opined that Plaintiff was able to lift/carry up to twenty-

five pounds occasionally and up to ten pounds frequently and stand/walk and sit each for four to

six hours in an eight-hour day and for one to two hours without interruption.  *Id.*

Plaintiff sought treatment in the emergency room on April 11, 2006, for back

pain.  (Tr. 534-42).  The treating physician noted that Plaintiff had a bit of tenderness in the

paraspinal muscles, no neurologic or vascular deficits, and that he had a bit of muscle spasm.  *Id.*

Plaintiff was treated and released with the diagnosis of low back strain with muscle spasm.  *Id.*

Plaintiff again sought emergency room treatment for back pain on June 6, 2006,

and July 6, 2006.  (Tr. 549-55; 556-66).  On both occasions, the treating physicians reported, at

worst, minimal physical findings, and Plaintiff was treated and released.  *Id.*

The record contains a copy of Plaintiff's mental health treatment notes from DayMont/Focus Care dated July 14, 2005, through December 28, 2006. (Tr. 479-533; 579-80). Those notes reveal that Plaintiff received treatment at that facility for major depressive disorder, recurrent and moderate, and panic disorder without agoraphobia and his GAF was 64. *Id.*

In February, 2006, Dr. Pasha, Plaintiff's treating psychiatrist at Focus Care, reported that Plaintiff was depressed, anxious, paranoid, suspicious, unable to focus and concentrate, and was not significantly to moderately to markedly limited in his abilities to perform work-related mental activities. *Id.* Dr. Pasha identified Plaintiff's diagnoses as major depression, recurrent, and bipolar disorder. *Id.*

Dr. Pasha reported on April 6, 2006, that Plaintiff had ideas of reference and paranoid thoughts, was irritable, experienced panic attacks, was depressed, and that he frequently had cognitive impairments. *Id.* Dr. Pasha also reported that Plaintiff's status was poor but stable and that he was unemployable. *Id.*

On May 17, 2007, some five months after Plaintiff's last contact with care providers at Focus Care and four months after Plaintiff's administrative hearing, Dr. Pasha reported that Plaintiff's had fair to poor abilities with respect to performing work-related functions, was cooperative, irritable, depressed, angry, and had moderate to severe anxiety. (Tr. 581-83). Dr. Pasha also reported that Plaintiff was not able to stay focused for more than ten minutes, was not able to be around people, could not maintain attention, and that he was not able to relax at any time due to chronic pain. *Id.* Dr. Pasha identified Plaintiff's diagnoses as major depression, recurrent and moderate, bipolar disorder NOS, and panic disorder with agoraphobia and he assigned Plaintiff a GAF of 65. *Id.*

Plaintiff alleges in his Statement of Errors that the Commissioner erred by failing to give controlling weight to Drs. Ryan's and Pasha's opinions. (Doc. 7).

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, quoting, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), quoting, 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406, *quoting, Wilson,* 378 F.3d at 544. "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial

---

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07, *citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for

14

discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

   Judge Padilla rejected Dr. Ryan's opinion on the basis that it is not supported by her clinical notes and is inconsistent with the other evidence of record. (Tr. 25-26). This Court agrees.

   Although Dr. Ryan opined that Plaintiff is capable of performing, at best, sedentary work, she failed to provide any objective findings to support that opinion. Specifically, when asked for support for her conclusion, Dr. Ryan merely cited "MRI results" and "patient comments". First, as noted above, the MRIs of record have revealed, at worst, diffuse degenerative disc disease. Second, "patient comments" are subjective allegations and are not objective clinical findings. In addition, a review of Dr. Ryan's office notes reveals that she documented few, if any, objective clinical findings. Indeed, those notes indicate that Dr. Ryan primarily prescribed pain and muscle relaxing medications.

   In contrast to Dr. Ryan's office notes and opinion, Dr. Koppenhoefer reported that Plaintiff had, at worst, limited ranges of spinal motion and some muscle tightness and that his neurological examination was normal. Similarly, Dr. Duritsch reported that Plaintiff had decreased ranges of motion of the dorsolumbar spine and that his neurological examination was normal. Further, Dr. Ryan's opinion is inconsistent with treating pain physician Dr. Moore's clinical findings which included, at worst, some paraspinal tenderness and spasms. In addition, Dr. Ryan's opinion is inconsistent with the findings of the several emergency room treating

physicians of record who reported that Plaintiff displayed, at worst, spasms and tenderness on palpation[2]. Finally, Dr. Ryan's opinion is inconsistent with the reviewing physicians' opinions. (Tr. 342-46; 41)

Under these facts, the Commissioner had an adequate basis for not giving Dr. Ryan's opinion controlling weight and for rejecting that opinion.

Plaintiff argues next that the Commissioner erred by failing to give controlling weight to treating psychiatrist Dr. Pasha's opinion that he is unemployable.

As he did with Dr. Ryan's opinion, Judge Padilla rejected Dr. Pasha's opinion on the bases that it is not supported by Dr. Pasha's treatment notes and is inconsistent with other evidence of record. (Tr. 27).

Although Dr. Pasha opined that Plaintiff is unemployable, a review of Plaintiff's treatment notes from Focus Care reveals that Plaintiff saw Dr. Pasha primarily for medication management and that he received counseling services from other personnel at Focus Care. Nevertheless, those treatment notes reveal that Plaintiff was generally assigned a GAF of 64 to 65, indicating, at worst, "some" difficulties in functioning. In addition, Plaintiff's treatment notes reveal that over time, Plaintiff was less depressed, was sleeping better, that his medications were helpful, and that he was doing fairly well. Further, Dr. Pasha's opinion is inconsistent with Dr. Boerger's opinion that Plaintiff is, at worst, moderately impaired in his abilities to interact with others and withstand the stress of day-to-day work activity and with the reviewing psychologists' opinions. (Tr. 245-60).

Under these facts, the Commissioner had an adequate basis for failing to give Dr.

---

[2] Similarly, the several short-term treating physicians of record reported few, if any, positive clinical findings. Judge Padilla noted Plaintiff's "doctor shopping" or "drug seeking" behaviors. (Tr. 26).

16

Pasha's opinion controlling weight and for rejecting that opinion.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

June 16, 2010.

*s/ Michael R. Merz*
United States Magistrate Judge

NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days

after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).